AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

OCT - 8 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| United States of America<br><br>Plaintiff,<br>v.<br><br>CHRISTOPHER MICHAEL LOVE, SAMUEL DAVID FRANK, and BRANDON MICHAEL PAUL WYATT,<br><br>Defendants. | Case No. 19MJ04283 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of June 13, 2019 to June 24, 2019 in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
*Complainant's signature*

James Keenan, USPS Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/8/19

STEVE KIM
*Judge's signature*

City and state:  Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, James Keenan, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against CHRISTOPHER MICHAEL LOVE ("LOVE"), SAMUEL DAVID FRANK ("FRANK"), and BRANDON MICHAEL PAUL WYATT ("WYATT") for a violation of Title 18, United States Code, Section 1344(2) (Bank Fraud).

2.    This affidavit is also made in support of applications to search the following:

a.    FRANK's home located at 13920 Moorpark Street, Unit #309 in Sherman Oaks (the "SUBJECT PREMISES 1"), as described more fully in Attachment A-1.

b.    LOVE's home located at 4655 Natick Ave, Unit #2 in Sherman Oaks (the "SUBJECT PREMISES 2"), as described more fully in Attachment A-2.

c.    LOVE's person, as described more fully in Attachment A-3.

d.    FRANK's person, as described more fully in Attachment A-4;

e.    WYATT's person, as described more fully in Attachment A-5;

f.    FRANK's vehicle (the "SUBJECT VEHICLE 1"), as described more fully in Attachment A-6; and

g.    LOVE's vehicle (the "SUBJECT VEHICLE 2"), as described more fully in Attachment A-7.

3.    The requested search warrants seek authorization to
seize evidence, fruits, and instrumentalities of violations of
Title 18, United States Code, Sections 1028A (Aggravated
Identity Theft), 1029 (Access Device Fraud), 1344 (Bank Fraud),
1349 (Bank Fraud Conspiracy), and 1343 (Wire Fraud)
(collectively, the "Subject Offenses"), as described more fully
in Attachment B.  Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7
and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants,
and does not purport to set forth all of my knowledge of our
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. **BACKGROUND FOR POSTAL INSPECTOR JAMES KEENAN**

5.    I am a Postal Inspector with the United States Postal
Inspection Service ("USPIS") and have been so employed since
June 2015.  I am currently assigned to the Los Angeles Division
Mail Theft Team, which investigates crimes against the United
States Postal Service ("USPS") and crimes related to the misuse
and attack of the mail system, including theft of United States
mail, fraud, and related activity in connection with access
devices (including credit and debit cards), identity theft, and
unauthorized use of personal identifying information.  I

completed a twelve-week basic training course in Potomac,
Maryland.  That course included training in the investigation of
identity theft by those stealing from, and using, the United
States mail system.  Before becoming a Postal Inspector, I
worked as a Customs and Border Protection Officer at the San
Ysidro Port of Entry for approximately three years.  I also
completed a six-month basic training course at the Federal Law
Enforcement Training Center.  Through my discussions with other
Postal Inspectors, I have learned additional information about
mail theft investigations and common mail theft and identity
theft practices, as well as the use of digital devices in
committing related crimes.

### III.  SUMMARY OF PROBABLE CAUSE

6.  Surveillance videos and images that correspond to the
same dates, times, and places as the unauthorized purchases on
victim V.M.'s American Express credit card ending in 3009 (the
"AMEX Card") show LOVE, FRANK, and/or WYATT using the AMEX card.
After making these purchases, LOVE, FRANK, and/or WYATT drove
away in one of the SUBJECT VEHICLES on multiple occasions.  V.M.
does not know LOVE, FRANK, or WYATT and have never provided
authorization for them or anyone else to use his AMEX Card.

7.  Through surveillance operations and a review of
vehicle GPS tracker information, I was able to determine that
FRANK resides at SUBJECT PREMISES 1, that LOVE resides at
SUBJECT PREMISES 2, and that the SUBJECT VEHICLES will be
located at the SUBJECT PREMISES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports, surveillance videos, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    The AMEX Card Was Used to Make Unauthorized Purchases

9.    On or about July 8 and 25, 2019, I spoke with Peter Grimm ("Grimm"), the Senior Special Agent of Investigations Global Security at American Express, and victim V.M., separately regarding unauthorized purchases on V.M.'s AMEX Card and learned the following:

a.    V.M. lost his wallet and the AMEX Card after making a purchase at a restaurant called "Forage," on or about June 12, 2019.  V.M. spent the next several days looking for them in his home, but failed to find either.

b.    Several days later, V.M.'s business manager told him about possible fraudulent charges on the AMEX Card.  On or about June 20, 2019, V.M. filed a claim online with American Express to report that his AMEX Card was missing and that it had been used to make several unauthorized purchases.

10.    As of July 8, 2019, the AMEX Card was charged for unauthorized purchases totaling approximately $80,474.75, in addition to attempted unauthorized purchases totaling approximately $52,922.09.  I received and reviewed copies of these transactions.

**B.   Surveillance Videos Related to the Unauthorized Purchases Showed LOVE, FRANK, and WYATT using the AMEX Card**

11.   Based on my review of images and surveillance videos that correspond to the same dates, times, and places of several unauthorized purchases, I know the following:

a.   On or about June 13, 2019, a white man, who I later identified using Department of Motor Vehicle ("DMV") photographs, booking photographs, and facial software recognition software as WYATT, and a black man, who I later identified using DMV photographs as LOVE, made the following unauthorized purchases using the AMEX Card at a Target store at 7100 Santa Monica Boulevard in Los Angeles, CA:

| Approximate Time | Unauthorized Purchase Amount |
| --- | --- |
| 9:24 p.m. | $499.74 |
| 9:34 p.m. | $947.81 |
| 9:49 p.m. | $893.63 |

b.   On or about June 14, 2019, persons who looked like LOVE and WYATT made the following unauthorized purchases using the AMEX Card at the same Target and a Maxfield at 8825 Melrose Avenue in Los Angeles, CA:

| Approximate Time | Unauthorized Purchase Amount |
| --- | --- |
| 12:54 p.m. | $56.09 |
| 1:52 p.m. | $1,419.78 |

| | |
|---|---|
| 1:55 p.m. | $2,321.42 |
| 2:20 p.m. | $1,311.28 |
| 6:46 p.m. | $1,007.40 |

c.    On or about June 15, 2019 at approximately 7:32 p.m., persons who looked like LOVE and WYATT made a purchase of $3,317.85 using the AMEX Card at a Nordstrom store at 6301 W. 3rd Street in Los Angeles, CA.

d.    On or about June 15, 2019 at approximately 9:02 p.m., at a Bloomingdales at 8500 Beverly Boulevard in Los Angeles, CA, a person who looked like LOVE made a purchase of $5,639.25.  At approximately 9:09 p.m., persons who looked like LOVE and WYATT and an unknown black man made a purchase of $1,231.88.  The AMEX Card was used for each transaction.

e.    On or about June 16, 2019, persons who looked like LOVE and WYATT and a white man, who I later identified using DMV photographs as FRANK, made or attempted to make the following unauthorized purchases using the AMEX Card at the Nordstrom:

| Approximate Time | Unauthorized Purchase Amount |
|---|---|
| 4:08 p.m. | $3,378.08 |
| 4:15 p.m. | $2,529.45 |

f.    On or about June 17, 2019, persons who looked like LOVE and WYATT made or attempted to make the following unauthorized purchases using the AMEX Card at the Maxfield:

| Approximate Time | Unauthorized Purchase Amount |
|---|---|
| 6:00 p.m. | $4,960.38 |
| 6:03 p.m. | $4,798.85 |
| 6:18 p.m. | $8,760.00 |
| 6:19 p.m. | $7,884.00 |
| 6:22 p.m. | $6,132.00 |
| 6:26 p.m. | $372.32 |

g.   On or about June 17, 2019, persons who looked like LOVE and FRANK and an unknown black man attempted to make unauthorized purchases totaling $4,938.45 using the AMEX Card at a Louis Vuitton store at 8500 Beverly Boulevard in Los Angeles, CA.   When the transaction was rejected, LOVE, FRANK, and the unknown black man left the store.

h.   On or about June 18, 2019, at the Nordstrom, a person who looked like LOVE and an unknown black man made a purchase of $1,941.44, at approximately 6:28 p.m., and a purchase of $405.15, at approximately 6:39 p.m., using the AMEX Card.

i.   On or about June 19, 2019, at approximately 3:12 p.m., a person who looked like LOVE and an unidentified black man made a purchase of $1,002.01 at the Target using the AMEX Card.

j.   On or about June 19, 2019 at approximately 4:45 p.m. at the same Nordstrom, persons who looked like LOVE and FRANK used the AMEX Card to make a purchase of $2,814.15.

k.   On or about June 19, 2019 at approximately 3:53 p.m., persons who looked like LOVE and WYATT made a purchase of $3,493.18 using the AMEX Card at Solestage, Inc. in Los Angeles, CA.

l.   On or about June 19, 2019, at approximately 7:06 p.m. at the Maxfield, persons who looked like LOVE and FRANK made a purchase of $2,729.31 using the AMEX Card.

m.   On or about June 22, 2019, at approximately 10:44 a.m. at the Nordstrom, persons who looked like LOVE and WYATT made a purchase of $344.93 using the AMEX Card.  At approximately 10:45 a.m., persons who looked like LOVE and WYATT made a purchase of $2,020.28 using the AMEX Card.

n.   On or about June 24, 2019, at approximately 1:24 p.m. at the same Maxfield, persons who looked like LOVE and WYATT made a purchase of $2,203.71.  LOVE used the AMEX Card to pay for the transaction.  At approximately 1:27 p.m., persons who looked like LOVE and WYATT made a purchase of $2,200.97. LOVE used the AMEX Card to pay for the transaction.  At approximately 1:40 p.m., persons who looked like LOVE and WYATT made a purchase of $832.20.  WYATT used the AMEX Card to pay for the transaction.

o.   On or about June 24, 2019, at approximately 2:59 p.m. at Barneys New York, located at 9570 Wilshire Boulevard, Beverly Hills, CA, persons who looked like LOVE and WYATT made a purchase of $1,850.56.  WYATT appeared to hand the sales associate the AMEX Card and signed the signature pad to complete

the sale.  At approximately 3:02 p.m., persons who looked like LOVE and WYATT made a purchase of $1,806.76 using the AMEX Card.

    p.    On June 24, 2019, at approximately 3:56 p.m., at Saks Fifth Avenue, at 9600 Wilshire Boulevard, Los Angeles, CA, persons who looked like WYATT and LOVE made a purchase of $1,533.00 using the AMEX Card.

### C.   After Making these Unauthorized Purchases, the Suspects Drove Away in SUBJECT VEHICLES 1 and 2 on Multiple Occasions

    12.   Following the purchases at the Maxfield store on or about June 14, 2019, surveillance videos show WYATT and LOVE driving away in SUBJECT VEHICLE 2.

    13.   Following the purchases at the Maxfield store on or about June 19, 2019, still images from surveillance videos show persons who looked like LOVE and FRANK placing merchandise into SUBJECT VEHICLE 1.

    14.   Following the purchases at the Maxfield store on or about June 24, 2019, still images from surveillance videos show WYATT and LOVE driving away in SUBJECT VEHICLE 1.

### D.   FRANK Resides at SUBJECT PREMISES 1

    15.   On or about August 20, 2019, Postal Inspector Adam Paulsen and I went to the residence in Sherman Oaks, CA listed on FRANK's driver license record.  I spoke with S.F., who identified himself as FRANK's father.  I confirmed with S.F. that FRANK drove a Hyundai.  S.F. also told me FRANK lived with his mother, T.G. at SUBJECT PREMISES 1.

    16.   That same day, Inspector Paulsen and I went to SUBJECT PREMISES 1 and accessed the parking garage, which was located

underneath the apartment complex.  SUBJECT VEHICLE 1 was parked in space number 7.

17.  On October 5, 2019, I messaged A.V., the Manager of SUBJECT PREMISES 1.  A.V. confirmed that SUBJECT PREMISES 1 has assigned parking and that space number 7 in the garage belongs to SUBJECT PREMISES 1.  A.V. said she is familiar with FRANK and that FRANK lives with his mother at SUBJECT PREMISES 1.  A.V. confirmed that FRANK drives a black Hyundai.

**E.   Vehicle Trackers Placed on SUBJECT VEHICLES 1 and 2**

18.  On September 5, 2019, I swore out search and seizure warrants 19-MJ-03687 for SUBJECT VEHICLE 2 and 19-MJ-03688 for SUBJECT VEHICLE 1 before the Honorable Maria A. Audero, United States Magistrate Judge.

19.  On September 9, 2019 at approximately 8:15 a.m., Special Agent ("SA") Sade Moore of the United States Secret Service ("USSS") and I placed a GPS tracking device on SUBJECT VEHICLE 1, which was found to be located in the parking garage of SUBJECT PREMISES 1 in space number 7.  We began receiving regular GPS location data of SUBJECT VEHICLE 1 approximately every fifteen minutes or less thereafter.

20.  On September 11, 2019 at approximately 3:45 p.m., USSS S.A. Moore, USPIS Postal Inspectors Chris Siouris and Francisco Solorio-Perez, and I conducted surveillance using GPS location information from SUBJECT VEHICLE 1.  We tracked SUBJECT VEHICLE 1 to the area of the SUBJECT PREMISES 2 and upon our arrival conducted surveillance on foot and in our law enforcement

vehicles in an attempt to locate SUBJECT VEHICLE 1 but did not see the car.

   a.   At approximately 8:34 p.m., SUBJECT VEHICLE 1 began moving away from the area and the GPS location data began updating.  We tracked SUBJECT VEHICLE 1 to a 76 Gas Station located at 14478 Ventura Boulevard, Los Angeles.  Once at the 76 gas station, we saw SUBJECT VEHICLE 1 at a gas pump but did not see any occupants with the car.

   b.   At approximately 8:47 p.m., we saw persons who looked like LOVE, FRANK and an unidentified black male return to SUBJECT VEHICLE 1 and socialize outside the car before getting inside of it.  FRANK got into the driver side of SUBJECT VEHICLE 1, while LOVE got into the front passenger seat.  The unidentified black male got into the rear passenger seat directly behind the driver seat.  S.A. Moore took photographs of FRANK, LOVE and the un-identified black male as they returned to SUBJECT VEHICLE 1.

   c.   At approximately 8:55 p.m., we saw all three occupants drive off in SUBJECT VEHICLE 1 and make a left turn out of the 76 gas station parking lot onto Ventura Boulevard. Postal Inspectors Siouris and Solorio-Perez trailed SUBJECT VEHICLE 1 and watched as it returned to the SUBJECT PREMISES 2 and park in the second garage space on the left side of the SUBJECT PREMISES 2 condominium complex.  The garage door opened, the SUBJECT VEHICLE 1 pulled inside the garage and the garage door closed.  At approximately 9:30 p.m., we concluded our surveillance at SUBJECT PREMISES 2.

21.  On September 13, 2019 at approximately 3:45 p.m.,
Special Agent Moore, along with Postal Inspectors Siouris,
Solorio-Perez, and I, conducted a mobile surveillance at SUBJECT
PREMISES 2.  At approximately 4 p.m., Postal Inspector Solorio-
Perez saw SUBJECT VEHICLE 2 arrive and informed me that WYATT
appeared to be driving SUBJECT VEHICLE 2.  WYATT parked in the
second garage space on the left side of the SUBJECT PREMISES 2
condominium complex.

22.  At approximately 4:15 p.m., I made my way into the
courtyard of the apartment complex for SUBJECT PREMISES 2 near
the pool area.  I noticed that SUBJECT PREMISES 2 appeared to be
directly above the garage that we had previously associated with
SUBJECT VEHICLE 1.

23.  At approximately 6:05 p.m. while SA Moore and I were
parked with a view of the garage associated with SUBJECT
PREMISES 2, we saw SUBJECT VEHICLE 1 arrive and the driver who
appeared to be FRANK exited the car and opened the garage door.
Upon the garage door opening, we could see another vehicle
parked on the left side of the garage which appeared to be
SUBJECT VEHICLE 2 (previously seen by Postal Inspector Solorio-
Perez arriving at SUBJECT PREMISES 2).

24.  At approximately 7:30 p.m., Postal Inspector Solorio-
Perez and I went into the apartment complex and attempted to
make contact with various home owners.  We left a business card
with some of the tenants and requested contact information for a
homeowner's association board member so we could follow up on

the status of SUBJECT PREMSIES 2.  We concluded our surveillance of SUBJECT PREMISES 2 at approximately 9:30 p.m.

25.  On September 14, 2019 at approximately 10:47 a.m., I received a voicemail and returned a phone call to T.S. who told me that he is a homeowner's association board member at the apartment complex associated with SUBJECT PREMISES 2.  I told T.S. the reason for my call and a summary of our investigative actions at SUBJECT PREMISES 2.  T.S. said SUBJECT PREMISES 2 was being rented out to short-term leasers as the owner of SUBJECT PREMISES 2, M.K., had moved to San Francisco, CA.  T.K. said he would give M.K. my phone number so she could contact me directly.

26.  On September 14, 2019 at approximately 3:04 p.m., I spoke with M.K. on the telephone and learned the following:

a.  M.K. is the owner of SUBJECT PREMISES 2.  M.K. moved out to San Francisco a while back and needed to rent out SUBJECT PREMISES 2.  M.K. allows individuals to sign short-term lease agreements of a minimum of one year minimum.  M.K. said only one person resided in SUBJECT PREMSIES 2 as of the most recent lease agreement or about July 14, 2019, and that no cars were registered to SUBJECT PREMISES 2 on that agreement.

b.  M.K.'s current tenant at SUBJECT PREMISES 2 goes by the name of "Penny Church" and uses a rapper's name of "Young Vous".  M.K. communicates with the SUBJECT PREMSIES 2 tenant via an email address, which the tenant recently had changed after he told M.K. that he experienced identity theft and needed to alter his email address.

13

27.  I told M.K. that I needed access to the garage associated with SUBJECT PREMSIES 2 as part of my investigation, and she provided me with the access code to the SUBJECT PREMISES 2 garage keypad so I could open the garage door.

28.  On September 14, 2019 at approximately 11:40 p.m., SA Moore, along with Postal Inspectors Siouris and Thai Quoc and I, used the garage access code that M.K. provided to install a GPS tracking device on SUBJECT VEHICLE 2, which was located in the garage of SUBJECT PREMISES 2.

29.  On September 21, 2019 at approximately 10:09 a.m. I texted M.K. several still screenshot images which I had previously taken of a video posted on what appeared to be LOVE's Instagram account.  The images appear to depict LOVE in a home and outside by a pool.  I asked M.K. to confirm if the images appear to depict the SUBJECT PREMISES 2.  M.K. responded ". . . Wow, i [sic] cant [sic] believe this.  That is indeed the inside of my unit . . . "  From this, I believe LOVE is the tenant of SUBJECT PREMISES 2.

30.  On September 25, 2019 at approximately 8:05 p.m., M.K. emailed me a copy of the lease agreement for SUBJECT PREMISES 2. I reviewed the lease agreement and learned that the telephone number listed was a registered T-Mobile number.  However, I was unable to validate the subscriber information.  I performed a Google search for the rapper "Young Vous" and learned his real name was "Ronald Golden Jr." from Los Angeles.  I researched the previous address provided for "Penny Church" and it returned "MMD Hollywood", a marijuana dispensary.

31.   On September 28, 2019 at approximately 11:00 a.m., I received a phone call from M.K. who said Intuit called her. M.K. went on to explain that Intuit processes the online payments made by the tenant in SUBJECT PREMISES 2 and that the previous payments the tenant in SUBJECT PREMISES 2 had attempted to make were declined using various account numbers.   M.K. recommended we get on a phone call together with Intuit to discuss the matter but when we attempted to do so, the offices had already closed.

32.   On October 2, 2019 at approximately 4:06 p.m., M.K., SA Moore and I got on a conference phone call and spoke with a representative from Intuit regarding the failed payments from the tenant of SUBJECT PREMISES 2.   During our conversations with Intuit, we learned the following:

a.   On July 16, 2019, an attempted payment was made to M.K. in the amount of $4,500.   The payment returned "unable to locate" [1] and was an ACH[2] transaction using a card ending in 1422.   The transaction did not process.

b.   On July 23, 2019, three different payment attempts were made to M.K. in the amount of $4,500 using three different credit cards ending in 4677, 1545 and 3421.   None of the payments was successfully processed.

---

[1] From my training and experience, I know the message of "unable to locate" when processing a transaction usually refers to the account number or name provided not corresponding.

[2] From my training and experience, I know "ACH" is Automated Clearing House which is an electronic authorization processing system used to debit directly from a customer's checking or savings account.

c.  On August 26, 2019, a payment was attempted in the amount of $4,500 to M.K. using a card ending in 9442.  This was again an ACH transaction and a "stop payment" request was made for this transaction by the payer.  The transaction did not process.

d.  On August 28, 2019, a payment was attempted in the amount of $4,500 to M.K. using a MasterCard ending in 3879. A stop payment was later applied by the payer and on August 31, 2019, a chargeback[3] occurred in the amount of $4,500 to the MasterCard ending in 3879.

e.  On September 20, 2019, a payment was attempted in the amount of $4,500 to M.K. using an account number ending in 9442, and Intuit received a "check writer return."  The Intuit representative explained this was the result of the bank requesting a stop payment for the transaction.

33.  On October 4, 2019 at approximately 3:45 p.m., SA Moore reviewed the GPS tracker information for SUBJECT VEHICLE 2.  From a review of the location data, SA Moore determined that since the tracker was installed on or about September 14, 2019, LOVE appears to be primarily associated with the SUBJECT PREMSIES 2.

34.  On October 5, 2019 at approximately 10:20 a.m., I reviewed the GPS tracker information for SUBJECT VEHICLE 1. From my review of the frequent stops made by FRANK, it appeared

---

[3] From my training and experience, I know a chargeback is a reversal of a prior outbound payment from a financial institution.

that FRANK returned to SUBJECT PREMISES 1 most nights, often in the early morning hours of the day before 6 a.m.

## V.   TRAINING AND EXPERIENCE REGARDING MAIL AND IDENTITY THEFT

35.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.   People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   It is a common practice for those involved in access device fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions in their homes and cars.

c.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use

magnetic card readers to read and re-encode credit cards.
Software relevant to such schemes can often be found on digital
devices, such as computers.  Such equipment and software are
often found in thieves' and fraudsters' residences and vehicles.

d.   It is common practice for individuals involved in
mail theft, identity theft, bank fraud, and access device fraud
crimes to possess and use multiple digital devices at once.
Such digital devices are often used to facilitate, conduct, and
track fraudulent transactions and identity theft.  Suspects
often use digital devices to perpetrate their crimes due to the
relative anonymity gained by conducting financial transactions
electronically or over the internet.  They often employ digital
devices for the purposes, among others, of: (1) applying online
for fraudulent credit cards; (2) obtaining or storing personal
identification information for the purpose of establishing or
modifying fraudulent bank accounts and/or credit card accounts;
(3) using fraudulently obtained bank accounts and/or credit card
accounts to make purchases, sometimes of further personal
information; (4) keeping records of their crimes;
(5) researching personal information, such as social security
numbers and dates of birth, for potential identity theft
victims; and (6) verifying the status of stolen access devices.

e.   Oftentimes mail and identity thieves take
pictures of items retrieved from stolen mail or mail matter with
their cellphones.

f.   It is also common for mail and identity thieves
to keep "profiles" of victims on digital devices.  Such

"profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

     g.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

   36.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[4] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    37.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

      a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

39.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to the SUBJECT DEVICES and any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LOVE, FRANK or WYATT's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of LOVE, FRANK or WYATT's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

40.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  REQUEST FOR NIGHT SERVICE

41.    I request that the Court authorize investigators to serve this warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  I believe there is good cause to warrant entry into SUBJECT PREMISES 1 and 2 between the hours of 10:00 p.m. and 6:00 a.m.  From my training and experience, I know that identity thieves often operate during the overnight hours when they can be masked by the cover of darkness and when it is harder for law enforcement officers to track their locations and movements.  Further, I know from my previous surveillances at SUBJECT PREMISES 2 and a review of historical vehicle tracker data for SUBJECT VEHICLE 1 and 2 that LOVE, FRANK and WYATT are active in the overnight hours, often making multiple trips throughout the Los Angeles area with their vehicles or inviting people over for late night parties.  This is further supported by my review of LOVE, WYATT and FRANK's

Instagram accounts which depict late night partying in their temporary stories feed and various individuals partying with them in what appears to be SUBJECT PREMISES 2.

42.   Therefore, night service of the search warrant is requested in order to effectively identify all parties involved in criminal activities at SUBJECT PREMISES 1 and 2, and to enter SUBJECT PREMISES 1 and 2 when it is least likely that LOVE, FRANK, WYATT, and others, would disturb or destroy the fruits, evidence, or instrumentalities of the Subject Offenses.

## VIII.   CONCLUSION

43.   For all of the reasons described above, there is probable cause to believe that LOVE, FRANK, and WYATT have committed a violation of Title 18, United States Code, Section 1344(2) (Bank Fraud).   There is also probable cause that the items to be seized described in Attachment B will be found in a search of SUBJECT PREMISES 1 and 2; the persons of LOVE,

//
//
//
//
//
//
//
//
//
//
//

FRANK, and WYATT; and SUBJECT VEHICLES 1 and 2, as described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, and A-7, respectively.

/s/
JAMES M. KEENAN
United States Postal
Inspector, United States
Postal Inspection Service

Subscribed to and sworn before me this _8_ day of October 2019.

STEVE KIM

THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE